EMILIO M. GARZA, Circuit Judge,
specially concurring:
I write separately, joined by Judge Parker, to request the Supreme Court to reconsider its opinion in Degen v. United States, — U.S. -, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996), and consider Degen’s application on the southwestern border of the United States.
Clearly, the Court did not consider the practical effects of Degen’s application peculiar to the southwestern border. In Degen, a federal grand jury indicted Degen for distribution of marijuana, money laundering and other crimes, and the government sought the forfeiture of properties in California, Nevada and Hawaii allegedly purchased with proceeds of Degen’s drug sales or used to facilitate the sales. Despite moving to Switzerland, a nation whose extradition treaty did not oblige it return Degen to the United States, Degen filed an answer in the civil action to contest forfeiture. The district court granted a government motion to strike Degen’s answer and entered summary judgment against him, holding that Degen was not entitled to be heard in the civil forfeiture action because he remained outside the country, unamenable to criminal prosecution. United States v. Real Property Located at Incline Village, 755 F.Supp. 308 (D.Nev.1990). The Ninth Circuit affirmed. United States v. Real Property Located at Incline Village, 47 F.3d 1511 (9th Cir.1995).
The Supreme Court reversed the Ninth Circuit, holding that the fugitive disentitlement doctrine did not permit the district court to enter summary judgment in favor of the government in a civil forfeiture case based on the claimant’s fugitive status. The Court found that the district court had alternative means of protecting the government’s interests and that therefore “the harsh sanction of absolute disentitlement” was not justified. Degen, — U.S. at —, 116 S.Ct. at 1782. The Court concluded that “[a] court made-rule striking Degen’s claims and entering summary judgment against him as a sanction [for failing to appear in the criminal proceedings] ... would be an arbitrary response to the conduct it is supposed to redress or discourage.” Id. at -, 116 S.Ct. at 1783.
Regardless of the merit of the Court’s concern for avoiding “an arbitrary response,” the practical effect of the Court’s decision is to encourage immigration to a “safe” country by creating a legal safe harbor for criminal defendants, an option particularly attractive to those defendants who reside and operate their criminal enterprises in the southwestern states. The economy, recreation, history and people in Texas cities such as Brownsville, Laredo, Eagle Pass, Del Rio and El Paso are virtually integrated with their sister cities of Matamoros, Nuevo Laredo, Piedras Negras, Cuidad Acuna and Juarez respectively; presumably border cities in New Mexico, Arizona and California exhibit similar integration with their Mexican counterparts. Mexican and American citizens alike regularly cross the border to conduct business, to purchase necessities, to enjoy entertainment, and to visit relatives on “the other side.” Indeed, for residents of border communities, crossing the international bridge is akin to visiting another part of town, not another nation. The international border is a barrier only in the legal sense that different laws govern each side of the line.
For the many United States district courts located in border districts, however, the bor *315 der compounds, rather than eliminates, legal problems. Smuggling and its attendant crimes — whether they involve cattle and horses in frontier times, cotton during the Civil War, arms during the Mexican Revolution, whiskey during Prohibition or narcotics in the late twentieth century — are endemic to the southwest border. Control of crime along the southwestern border is a constant struggle for the courts and law enforcement organizations charged with that responsibility. Degen would further encourage defendants to flout the laws of this nation and to preserve both their liberty and their property by simply “moving across town” to the other side of the border. The Court also exacerbates the difficulties most trial judges have managing their dockets. Even assuming the measures listed by the Court are effective “means to resolve these dilemmas,” id. at —, — U.S. at -, 116 S.Ct. at 1782, they further overburden courts that are already handling upwards of 1,000 criminal indictments annually. In addition, the three examples the Court gives as means by which district courts can address the dilemmas presented by defendants who simultaneously flee criminal prosecution and contest civil forfeitures will only increase the drain on scarce judicial resources.
The instant case exemplifies my concerns about Degen. Here, a grand jury returned a superseding indictment against Eduardo Gonzalez Quirarte, Avelino Gil-Terrazas, and several other individuals charging them with various narcotics offenses. The government alleged that Quirarte and Terrazas were the principals in the organization, with Terrazas running the drug smuggling operations in the United States and Quirarte running the operations in Mexico. After trial, Terrazas was convicted of conspiracy to distribute marijuana and cocaine and of money laundering. The court sentenced him to 360 months in custody.
Quirarte, however, did not appear for trial, fleeing with his wife from El Paso, Texas to Ciudad Juarez, Mexico to avoid prosecution. Quirarte has never returned to the United States to answer the criminal charges against him. He has, however, contested the civil forfeiture proceeding the government instituted against him based on the drug trafficking and money laundering activities alleged in the indictment. Protected by Degen, a criminal defendant such as Quirarte can make the short drive from El Paso to Juarez and thereby ensure both his immunity from the American criminal justice system and the protection of American civil laws. Surely the Supreme Court did not intend such a result.
As an aside, there are two federal judges in El Paso who preside over dockets with more than 400 criminal cases apiece. Degen will exacerbate, not “resolve [this] dilemma[ ].” Id., — U.S. at -, 116 S.Ct. at 1782.